# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SHAWN J.E. LUCHINSKI,**

        Petitioner,

    **-vs-**                       **Case No. 10-C-980**

**WILLIAM POLLARD,[1]**
**Warden, Waupun Correctional Institution,**

        Respondent.

---

# DECISION AND ORDER

---

Petitioner Shawn J.E. Luchinski ("Shawn")[2] is serving a total of 100 years in consecutive prison sentences. The sentences were imposed following the return of a jury verdict by the Circuit Court for Fond du Lac County, Wisconsin finding him guilty of three counts of repeated sexual assault of a child.[3] The counts involved three minors: J.L.L., the son of Shawn's brother Leslie; H.A.L., Shawn's daughter; and S.R.K., the daughter of Shawn's long-time live-in girlfriend Kelly G. S.R.K. spent alternate weekends at Shawn

---

[1] The Court has substituted William Pollard, the current warden of Waupun Correctional Institution, for original Respondent Michael Thurmer. *See* Rule 2(a) of the Rules Governing § 2254 Cases in U.S. Dist. Courts.

[2] To avoid confusion, adult members of the Luchinski family are referred to by given name.

[3] The jury verdicts were in Fond Du Lac County Circuit Court case numbers 2003CF00407: one count relating to the repeated sexual assault of J.L.L.; and 2004CF0053: two counts relating to the sexual assault of H.A.L. and S.R.K.. The cases were tried together. *See* https://wcca.wicourts.gov/ (last visited July 29, 2015).

and Kelly G.'s home and slept in H.A.L.'s bedroom.

Shawn's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 raises the following grounds for relief: (1) prosecutorial misconduct/outrageous governmental conduct; (2) ineffective assistance of counsel; (3) denial of his right to confrontation at trial; and (4) improper admission of other crimes evidence at trial. By a Decision and Order entered February 15, 2013, this Court held that based on its review of the answer and the transcripts of the state court proceedings, the Wisconsin Court of Appeals (the "appeals court") decision in *State v. Luchinski*, 771 N.W. 2d 928 (Wis. Ct. App. 2009), was not contrary to, or an unreasonable application of, clearly established Federal law as determined by the United States Supreme Court, 28 U.S.C. § 2254(d)(1), nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, 28 U.S.C. § 2254(d)(2).

Shawn appealed and prevailed. The Seventh Circuit Court of Appeals vacated this Court's order and remanded the matter pursuant to Circuit Rule 50. The Court now sets forth at length its analysis of Shawn's petition for relief.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner may obtain federal habeas relief based on a claim

of legal error only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Ford v. Wilson,* 747 F.3d 944, 949 (7th Cir. 2014) (quoting 28 U.S.C. § 2254(d)(1)). The Supreme Court has emphasized that this is a difficult standard to meet.

"[C]learly established Federal law" for purposes of § 2254(d)(1) includes only "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *Howes v. Fields,* 132 S. Ct. 1181, 1187 (2012) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000)). And an "unreasonable application" of those holdings must be "'objectively unreasonable,'" not merely wrong; even "clear error" will not suffice. *Lockyer v. Andrade,* 538 U.S. 63, 75-76 (2003). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 131 S. Ct. 770, 786-787 (2011); *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). (Parallel citations omitted).

In his petition, Shawn has focused on the application of law to the facts. Because Shawn has not argued that the appeals court made an unreasonable determination of the facts, those factual findings are presumed

- 3 -

to be correct, *see* 28 U.S.C. § 2254(e)(1), and are the basis upon which the Court considers whether the law as articulated by the Supreme Court was properly applied.

## Factual Background[4]

Shawn was convicted of multiple sexual assaults of three minors who were relatives or in a familial-like relationship. At the time of the assaults Shawn was between 23 and 27, J.L.L. was eight or nine years old, and H.A.L. and S.R.K. were between four and six years old.

According to City of Fond du Lac police officer Michael Nalley ("Nalley"), who was the school resource officer in four Fond du Lac elementary schools, an investigation was initiated in March 2003 based on reports of children having sexual activity with other children. (Nov. 10, 2004 Trial Tr. 43-44, 131.) (ECF No. 7-6). The inquiry changed scope and led to investigations involving sexual activity among adults, including Shawn and Leslie, and some of those children, and it ended in January 2004. (*Id.*) Nalley was the lead investigator. (Feb. 1, 2007, Post-Conviction Hr'g Tr. 86.) (ECF No. 8-7.)

H.A.L. told Nalley she had seen homemade digital nude photographs of adult and minor family members and friends on a computer in Shawn's home

---

[4] The factual background is based on the facts as found by the Wisconsin Court of Appeals which are presumed to be correct. Additional facts drawn from the materials attached to the Answer are accompanied by citation.

- 4 -

office. Based on this information, warrants for search and seizure of two computers were issued and executed. One computer was seized from Shawn's home. Kelly G. turned over the other computer after retrieving it from Daniel Ott ("Ott") and Raye Ann Koenigs ("Koenigs") who had purchased it from Shawn.

Shawn was arrested. (Nov. 10, 2004, Trial Tr. 46). While he was in jail awaiting trial, telephone conversations between Shawn, Kelly G., Ott and Koenigs pertaining to the second computer were recorded. Subsequently, Nalley prepared a report summarizing the recorded conversations and Ott's statement regarding them. The police were investigating to determine whether there was another computer, and when Nalley initially heard the conversations he believed that Ott and Koenigs were "holding back;" he did not mention that belief in his report of the conversations. (Feb. 1, 2007, Post-Conviction Hr'g Tr. 102-03.)

Prior to trial, Shawn's lawyer, William A. Mayer ("Mayer"), was aware that those conversations had been recorded, and he reviewed Nalley's report summarizing the conversations. Shawn told Mayer that Nalley's summary was inaccurate. In addition, the two computers were forensically examined but did not reveal any evidence of child pornography, digital camera nude sexual photos, or any evidence of tampering or wiping them clean.

Judge Dale L. English presided over the five-day jury trial in Fond Du

- 5 -

Lac County Circuit Court, which began with the testimony of the three minors: J.L.L., 13; S.R.K., 7; and H.A.L., 6. The appeals court found that the testimony of the two girls was confused and contradictory and included many statements indicating that they did not remember or know what Shawn did to them or what they had told investigators, and statements denying that Shawn assaulted them in certain ways.

J.L.L. testified that Shawn did things to him of a sexual nature in the dining room four or five times. (Nov. 9, 2004, Trial Tr. 11-13.) (ECF No. 7-5) Leslie, J.L.L.'s father, was in the house at the time but not in the same room where the incidents with Shawn took place. (*Id*. at 13, 21-22.) Shawn would sit on a chair, pull down his pants, and tell J.L.L. to suck his penis. (*Id*. at 14-15.) The sucking lasted a minute or less; when asked at trial what was happening with Shawn's penis while he was sucking on it, J.L.L. said that "stuff came out of the tip at the end." (*Id*. at 18). A similar incident occurred in the living room when Shawn and J.L.L. were sitting on the couch. (*Id*. at 19.) During a number of these incidents Shawn told J.L.L. not to tell anybody. (*Id*. at. 16, 18.)

J.L.L. also testified that he thought there was one time Shawn sucked his penis. (*Id*. at 17.) Leslie also did things of a sexual nature to J.L.L.; the incidents with Leslie occurred before, during, and after the time frame that Shawn was assaulting him (*Id*. at 22), but J.L.L. testified that he

- 6 -

remembered both of them doing things to him, and he was not confusing who did what. (*Id*. at 21). J.L.L. did not tell his father about the incidents with Shawn because Shawn told him not to. (*Id*.) While the incidents were occurring, J.L.L. did tell his cousin, Ben Osier ("Osier"), on more than one occasion that Leslie was sexually assaulting him (*Id*. at 22, 27-28), but he told Osier not to tell anybody because he was very fearful of Leslie (*Id*. at 27). Osier, who is about J.L.L.'s age, urged him to report it to somebody. (*Id*. at 28.) J.L.L. did not tell Osier about Shawn. (*Id*. at 29.)

Nalley interviewed J.L.L. about a year before the trial. (*Id*. at 24-25.) J.L.L. testified that initially all the questions were about Leslie until J.L.L said that Shawn did stuff with him. (*Id*. at 30-31.)

Nalley and Sharon Burns ("Burns"), a Fond du Lac County Department of Social Services social worker, testified regarding statements H.A.L. and S.R.K. made to them.

Burns, accompanied by her co-worker Kylee Ernest ("Ernest"), interviewed H.A.L. at her elementary school regarding Shawn's contact with her. (*Id*. at 165-67.) At the time of the interview H.A.L. was almost five. (*Id*. at 169.)

Using a forensic interview protocol for children, Burns ascertained that H.A.L. knew the difference between the truth and a lie, talked to her about being safe and unsafe, and asked if anybody had ever told her to keep any

- 7 -

secrets about being unsafe. (*Id.* at 170-74.) H.A.L. immediately shook her head in the affirmative, but when Burns asked who told her to keep the secret, she repeatedly said that she could not tell and became very stressed. (*Id.*)

Burns shifted to asking H.A.L. about her body parts, beginning in a "very benign way asking about her eyes and ears and elbows" and then asking her to point out the location of her "private parts" and those of a baby doll that H.A.L. was holding. (*Id.* at 174.) When Burns asked who had seen her private parts, H.A.L. said her mother. (*Id.* at 175.) Burns asked whether anyone had touched her private parts. (*Id.*) H.A.L. did not answer but said it hurts when they are touched. (*Id.*) Burns asked what the secret was about and who it was with. (*Id.*) H.A.L. became extremely upset and did not want to talk to Burns anymore, stating that people would get in big trouble if she told her secret and referencing her father being in trouble or going to jail. (*Id.* at 175-76.) Burns and H.A.L. agreed that she would feel safe telling her teacher. (*Id.*)

Burns got H.A.L.'s teacher, then Burns and Ernest left the room. (*Id.* at 177.) After about five minutes the teacher called them back and informed them the secret was that H.A.L. had been touched by Leslie and J.L.L.'s sister M.L. (*Id.*) Burns asked H.A.L. whether she had any other secrets; H.A.L. said that she had a secret about her father and immediately said that it only

- 8 -

happened once and was not happening anymore. (*Id*. at 178.) Burns asked where it happened, whether it was light or dark when it happened, and where her mom was when it happened. (*Id*.) H.A.L. responded it happened in her bedroom when it was dark, and her mom was downstairs sleeping. (*Id*.) H.A.L. also said that she had her jammies on and it hurt when her dad touched her. (*Id*.) Burns then telephoned Nalley. (*Id*. at 179.) Meanwhile, Ernest took H.A.L. out to a county vehicle, and H.A.L. stated that she had lied and it happened more than one time. (*Id*.) After rejoining them, Burns asked H.A.L. whether it really happened more than one time as she had told Ernest, and H.A.L. said "yes." (*Id*.) When Burns asked if H.A.L. was telling the truth, she said "yes." (*Id*.)

At the request of S.R.K.'s father, Nalley interviewed S.R.K., who was then about six, in a Fond du Lac police department interview room. (Nov. 10, 2004, Trial Tr. at 53-54.) Nalley was aware of Burns' interview of H.A.L., which was the first time that Shawn had been linked to the investigation. (*Id*. at 46.) Nalley has extensive training in methods for interviewing children in general, and children who have been sexually assaulted in particular; he conducted about 60 or 70 sexual abuse interviews while he was the school resource officer. (*Id*. at 49-53.)

Using a forensic interview protocol for children similar to that used by Burns, Nalley ascertained that S.R.K. knew the difference between the truth

- 9 -

and a lie and the importance of telling the truth, could identify body parts, and understood the concept of private parts and the body parts that are private. (*Id*. at 54-58.) Nalley estimated that S.R.K. was of average to above-average intelligence. (*Id*. at 59.)

S.R.K. reported that she slept on the top bunk, stating that she would awaken and see Shawn having inappropriate sexual contact with H.A.L. on the lower bunk. (*Id*. at 73-74, 86.) Nalley asked S.R.K if anyone had broken the rules of touching, and she responded "Shawn does;" Nalley then asked how a person could break the rules of touching, and S.R.K. said that a person could use their hands, mouth or private parts to touch her private parts. (*Id*. at 80.)

When Nalley asked S.R.K. whether Shawn had ever used his private parts to touch her private parts, she said "no." (*Id*. at 85.) When Nalley asked whether Shawn had used his hands to break the touching rules, S.R.K. responded that he had touched her ten times and most of the touching was by hand. (*Id*. at 80-81.) Nalley also testified that S.R.K said that the ten times happened at their present house, and that some number of times less than ten happened at the old house. (*Id*. at 81.) She told him the touching occurred in her bedroom at various times while she was sleeping; she woke up and felt Shawn's hand reaching inside her pajamas and his index finger touching the outside of her vagina and rubbing repeatedly. (*Id*.) Nalley asked S.R.K. how

- 10 -

it felt, and she replied it felt hot; when Nalley asked how Shawn was able to do it, she said that he had stepped onto a bench to get high enough. (*Id.* at 84.)

S.R.K. stated that sometimes Shawn also placed the same index finger inside her vagina, stepping onto the bar of the lower bunk bed so he could reach. (*Id.* at 81-82.) Nalley had S.R.K. demonstrate her understanding of the concepts of inside and outside using an opening in a nearby table. (*Id.* at 82.) When asked if her clothing was on or off, S.R.K. stated that once it was on and twice Shawn had pulled down her pants or underwear. (*Id.* at 84-85.)

Nalley also asked her how Shawn's touching felt; she said Shawn was gentle most of the time — sometimes it hurt and sometimes it did not. (*Id.* at 83.) She also said it felt "yuck." (*Id.*)

According to Nalley, S.R.K. described three different occasions when she was in the upper bunk bed in her room with purple carpet when she felt Shawn kissing her private area, meaning her vagina. (*Id.* at 83-84.) Asked whether she had told anyone about this conduct, S.R.K. said "no;" asked why, S.R.K. replied because Shawn said that he would spank her. (*Id.* at 85.) S.R.K.'s demeanor when discussing Shawn's sexual contact with her was matter of fact. (*Id.* at 86.)

Nalley also testified regarding his subsequent observations in Shawn's home. (*Id.* at 87-88.) He saw H.A.L.'s bedroom, which she shared with S.R.K.

- 11 -

every alternate weekend, and observed the bunk bed and a hard plastic Cookie Monster bench. (*Id*. at 87-88.) He stood on the bench to see whether it was sturdy enough to stand on. (*Id*. at 88.) Nalley estimated that he and Shawn are about the same height, so he and another officer measured to determine whether a person could reach the top bunk with his hand to touch a child, and also tested to see if it was physically possible, which they found it was. (*Id*. at 88-89.)

Nalley also testified regarding a joint interview of H.A.L. and S.R.K. (*Id*. at 70.) Nalley began by speaking to S.R.K. alone in the interview room for about five minutes. (*Id*. at 101.) He told her that H.A.L. was going to be joining them for the interview and stressed the importance of telling the truth and that it was going to be an important day. (*Id*. at 101-02.) S.R.K. complained about Kelly G. yelling at her on the phone. (*Id*.) Nalley testified that during the interview S.R.K. was upset and depressed. (*Id*. at 103.) Sue Sielske, a social worker, then brought H.A.L. into the room. At the time of the interview, S.R.K. was six and H.A.L. had just turned five. (*Id*.)

Nalley testified that H.A.L. was of average intelligence; talkative when she was comfortable and shy other times. (*Id*. at 70.) She also understood the difference between the truth and lies and the importance of telling him the truth. (*Id*. at 71, 105.) He also made sure that she understood the concept of private areas of the body and areas that are common for touching. (*Id*. at 105-

06.)

Nalley began by asking S.R.K. how old she was when Shawn began touching her and where it had occurred. (*Id*. at 107.) She responded that it started at the old house when she was two and had occurred more frequently at the new house. (*Id*.) Nalley asked which of the two girls Shawn had touched first; S.R.K. said it was H.A.L., but H.A.L. said it only started happening with her at the new house. (*Id*. at 108.) S.R.K. then stated that A.V., their half-brother, had told her about incidents between H.A.L. and Shawn. (*Id*.) H.A.L. did not respond; then S.R.K. stated that she thought Shawn's touching started with A.V. (*Id*.)

S.R.K. also said Shawn touched H.A.L. most often. (*Id*. at 116.) H.A.L. agreed. When Nalley asked how it occurred, H.A.L. said Shawn kneeled on the floor beside her bed, pulled her pants and underwear down, and placed his mouth against her vagina. (*Id*. at 116-17.) When asked how it felt, H.A.L. said it felt good. (*Id*.)

H.A.L. described awakening during the night at the new house, going downstairs to the living room, seeing Shawn touching S.R.K. who was asleep on the couch, and watching as he pulled down S.R.K.'s pants, put his mouth to her vagina, and licked it. (*Id*. at 112.) H.A.L. related this incident three times during the interview, as if she was telling a new story each time. (*Id*. at 117.) In one telling, she made a gasping noise, saying that Shawn heard her make

- 13 -

the noise and said she better not tell anyone that he did this, and if she did he would give her a big spanking. (*Id*. at 118-19.) Nalley also asked S.R.K. if Shawn told her not to tell about what he was doing, and S.R.K. said Shawn said if she did, he would slap her face. (*Id*. at 119.)

Nalley showed the girls photographs of their bedroom, they confirmed that S.R.K. slept on the upper bunk during her visits and H.A.L. slept on the lower. (*Id*. at 113.) Without being asked a question S.R.K. pointed to the upper bunk and said that's where Shawn touched me. (*Id*.) Nalley asked how Shawn touched her; S.R.K. pointed her index finger to the rungs at the head of bed and said that he climbed up, lay down with her, and placed his mouth against her vagina. (*Id*. at 113-14.)

S.R.K. then made a statement that H.A.L. had been touched by Shawn in A.V.'s bedroom, and H.A.L. said "yes." (*Id*. at 114.) Nalley then asked H.A.L. whether Shawn touched her in A.V.'s bedroom and she said "no." (*Id*. at 115.) He went on to name other rooms in the house, each time asking if Shawn had touched her in them; H.A.L. replied "no" to each room until Nalley mentioned her bedroom, and said "yes" to her room and the bottom bunk, and "no" to the upper bunk. (*Id*.)

Nalley also asked H.A.L. how many times Shawn had put his mouth to her vagina and she said a few times and that it only happened at the new house. (*Id*. at 120.) He asked S.R.K. whether Shawn had his shirt or any

- 14 -

clothes off or on when he did this; she said that a couple of times he had his shirt off but most of the time he was wearing his shirt. (*Id*.) H.A.L. said that he was always wearing his shirt. (*Id*.) Nalley also clarified with S.R.K. where the touching occurred; she indicated in her top bunk and that in that bunk he touched her vagina with his hand, mouth and private, meaning his penis. (*Id*. at 121.)

Nalley asked both girls if they had seen Shawn's private. (*Id*. at 123.) S.R.K. said "yes" immediately; in response to Nalley's request she drew it, then H.A.L. also drew it. (*Id*.) Both girls completed drawings and provided additional descriptive information about the penis shape and area. (*Id*. at 123-24.) Nalley asked whether Shawn had ever put his penis in the mouth of either girl. (*Id*. at 123.) S.R.K. said "no;" H.A.L. said "yes," but a long time ago at the old house. (*Id*. at 124) In response to questioning, both girls indicated they had not seen anything coming out of Shawn's penis. (*Id*. at 126.)

Nalley asked the girls if anyone else had told them not to talk about what Shawn was doing. H.A.L. said that Kelly G. had told her not to tell the cops because if she did she would never see S.R.K. again. (*Id*.) H.A.L. remembered an incident when Kelly G. found her in bed with her pants and underpants down, and H.A.L. told her that daddy came up to her room and licked her and pulled her pants and underwear down. (*Id*. at 127.)

- 15 -

Other acts evidence was admitted regarding Shawn's prior sexual contact with a four-year-old nephew and three nieces, who were about nine and ten at the time. Shawn was between 13 and 19 at the time of those other acts. No evidence regarding the computers or the taped conversations was presented at trial.

In February 2005, Judge English sentenced Shawn in both cases, and judgments were entered. In November, Joseph Sommers ("Sommers") became counsel for Shawn and represented him throughout the post-conviction and subsequent state proceedings (see https://wcca.wicourts.gov/ (last visited July 29, 2015)) as well as in this action until he was allowed to withdraw in May 2012 (ECF No. 12).

Between January 2006 and February 2007, Judge English presided over three post-conviction hearings and two status hearings. Shawn raised the following inter-related issues during those hearings: (1) evidence was withheld by the prosecution in violation of his constitutional and statutory rights; (2) he was denied effective assistance of trial counsel; (3) hearsay evidence was improperly admitted at trial; (4) other acts evidence was improperly admitted at trial; (5) he was entitled to a new trial based on newly discovered evidence; and (6) he was entitled to a new trial in the interest of justice.

During post-conviction testimony, Laurie Nichols ("Nichols"), who

provided therapy for J.L.L. and his sister, M.L., testified as to a note she had made about a conversation with Nalley during which Nalley described J.L.L.'s disclosure that Shawn had sexually assaulted him. The note states that Nalley described J.L.L. as having made a "dramatic disclosure" after initially "just not disclosing." (Jan. 26, 2006, Motions Hr'g Tr. 71.) (ECF No. 8-4). It also states that she asked Nalley if he was aware there was sexual contact between J.L.L. and M.L., and Nalley said he was but chose not to charge J.L.L. (*Id.* at 72.)

Nalley testified he had told Nichols he was aware that J.L.L. allegedly had sexual contact with M.L. based on an interview in which M.L. identified "Joe" as a person with whom she had sexual contact. Nalley assumed, but did not know, that "Joe" was J.L.L. (Feb. 1, 2007 Post-Conviction Hr'g Tr. 143.) At no point did Nalley contemplate any charge against J.L.L. because it was a child-on-child touching matter. (*Id.* 143.) Nalley never questioned J.L.L. about it. (*Id.* at 145.) The appeals court found that post-conviction testimony also indicated Nalley passed the list of people M.L. said she had sexual contact with to the social services department, but social workers did not make the assumption that "Joe" referred to J.L.L. and never investigated an allegation of sexual contact between J.L.L. and M.L.

In a separate post-trial hearing, Mayer testified that the prosecutor told him prior to trial that nothing had been found on the computers. Mayer

- 17 -

also testified that he did not know that the computers had undergone forensic examination.

The trial court denied Shawn's motion for post-conviction relief in a lengthy oral decision. (Feb. 23, 2007, Post-Conviction Hr'g Tr. 73-120.) (ECF No. 8-8.) The court denied Shawn's ineffective assistance of counsel claim, concluding that Shawn failed to prove he was prejudiced by trial counsel's performance. In so concluding, the judge determined that evidence regarding the computer forensic report and the audiotapes would not have been admitted at trial because it constituted inadmissible extrinsic evidence on a collateral matter and did not go to whether Shawn sexually assaulted the three children. The appeals court affirmed the trial court's denial of the motion and upheld Shawn's conviction.

## Analysis

### *Prosecutorial Misconduct[5]*

Shawn alleges that the appeals court mis-applied controlling United States Supreme Court law regarding the state's misconduct due to its pretrial failure to provide him with (1) the results of the forensic examination of the

---

[5] Shawn has used this label loosely. He has not asserted a claim of prosecutorial misconduct as a violation of his due process right to a fair trial, when the legal issue to be resolved is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). (Citation omitted.)

- 18 -

computers, (2) a copy of the audiotapes of the jail telephone conversations, and (3) information indicating that J.L.L. might have falsely alleged Shawn assaulted him because J.L.L. was concerned he would be charged with having sexual contact with his sister, M.L.; all of which Shawn asserts violated his constitutional right to be provided with exculpatory evidence.

Shawn contends the lack of child pornography and homemade sex photos on the computers and the fact that there was no evidence the computers had been tampered with and/or wiped clean would have cast doubt on Nalley's and/or H.A.L.'s testimony, establishing that either H.A.L.'s description of seeing those images or Nalley's report of what H.A.L. related was a lie. Shawn contends that the discrepancies between the content of the audiotapes of the jailhouse conversations and Nalley's report describing them would have established that Nalley was not a credible witness, and that playing the audiotapes for the jury would have demonstrated Nalley's lack of credibility.

According to the appeals court, Nichols' testimony regarding her note and conversation with Nalley did not provide a basis for a new trial. Nothing in the record proved that J.L.L. actually sexually assaulted M.L., and Nalley interviewed J.L.L. before the initial complaint charging Shawn with repeated sexual assaults of J.L.L. was filed Specifically, the appeals court held that the post-conviction testimony did not provide a basis to conclude that at the time

- 19 -

of his interview with Nalley: (1) J.L.L. knew that anyone had alleged he had sexual contact with M.L.; (2) J.L.L. was concerned that he would be charged with sexually assaulting M.L.; or (3) anyone had talked with J.L.L. about whether he would be charged with such conduct. The appeals court held that the record did not support a hypothesis that J.L.L. told Nalley that Shawn sexually assaulted him because J.L.L. was afraid he would be charged with the sexual assault of M.L. Therefore, there was no basis to conclude that, if evidence of the conversation between Nalley and Nichols had been presented at trial, the result of the proceeding would have been different.

In addition, because the evidence did not provide a basis to conclude that J.L.L.'s concern that he would be charged with sexually assaulting M.L. led him to implicate Shawn, the appeals court determined that the fact that the information regarding Nalley's conversation with Nichols was not disclosed prior to trial did not undermine confidence in the outcome of the trial. The appeals court thus found that there was no basis to conclude that Shawn was denied his constitutional or statutory right to exculpatory material.

In its analysis, the appeals court cited *State v. Harris,* 272 Wis. 2d 80, 680 N.W.2d 737, 745 (Wis. 2004), which discusses the leading United States Supreme Court cases on the issues of a prosecutor's obligations with respect to exculpatory and impeachment evidence. A prosecutor violates the due process

- 20 -

rights of a defendant if he or she fails to disclose evidence favorable to the accused. *Id.* Evidence favorable to the accused encompasses both exculpatory and impeachment evidence. *Id.* However, the evidence must also be material. *Id.* Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 746. The "reasonable probability" test is the same as the test for ineffective assistance of counsel, and requires a probability sufficient to undermine confidence in the outcome. *Id.* The mere possibility that undisclosed information might have helped the defense does not establish materiality. *Id. at 748. Harris* further states:

> In order to establish a *Brady* violation, the defendant must, in addition to demonstrating that the withheld evidence is favorable to him, prove that the withheld evidence is "material*." Giglio v. United States,* 405 U.S. 150, 154 . . . (1972) (stating that "[a] finding of materiality of the evidence is required under Brady "). A *Brady* violation may occur under three circumstances: 1) if the prosecutor fails to disclose that the defendant was convicted on the basis of perjured testimony; 2) if the defendant makes no *Brady* request and the prosecutor fails to disclose evidence that is favorable to the defendant; or 3) if the defense makes a specific Brady request and the prosecutor fails to disclose the requested material.

*Id.* at 746.

The appeals court rejected Shawn's contention that the prosecutor violated his constitutional rights by failing to disclose the forensic report and

- 21 -

audiotapes. It held that evidence H.A.L. lied or was mistaken about what she saw on Shawn's computer, and evidence that Nalley misrepresented what H.A.L. told him she saw or misrepresented the content of the taped conversations, was not evidence exculpating Shawn of the charges that he engaged in repeated sexual assaults of J.L.L., H.A.L., and S.R.K. And, although implicating credibility, it was not material.

The appeals court stated that the evidence regarding the results of the forensic examination of Shawn's computers was inadmissible because it was extrinsic evidence on a collateral matter, and evidence of discrepancies between the jail telephone audiotapes and Nalley's report summarizing them was inadmissible for the same reasons. Because such evidence was inadmissible, the appeals court held that there was no reasonable probability that if the evidence had been disclosed the result of the proceeding would have been different.

Evidence is not "material" under Brady unless the defendant shows there is a "reasonable probability" that disclosure of the evidence would have resulted in a different outcome at trial. *E.g., Strickler v. Greene,* 527 U.S. 263, 290 (1999); *Kyles v. Whitley,* 514 U.S. 419, 433-34 (1995); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *United States v. Morales,* 746 F.3d 310, 315 (7th Cir. 2014). "[I]t should take more than supposition on the weak premises offered by respondent to undermine a court's confidence in the outcome."

- 22 -

*Wood v. Bartholomew,* 516 U.S. 1, 8 (1995). The appeals court's conclusion regarding Shawn's lack of support for materiality was a reasonable application of *Brady* and its progeny. Moreover, even if the prosecutor disclosed the audiotapes and the results of the forensic examination of the computers, Shawn would not have been able to use that evidence at trial, *see* Wis. Stat. § 906.08(2), so the excluded evidence could not have been material. *See, e.g., United States v. Dabney,* 498 F.3d 455, 459 (7th Cir. 2007) (finding no *Brady* violation for undisclosed evidence of police complaints, because such evidence inadmissible under Fed. R. Evid. 608(b)); *United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir. 1995) (same as to misconduct allegation against police officer witness). Therefore, this ground does not provide a basis for habeas relief.

*Ineffective Assistance of Counsel*

Shawn challenges the appeals court's determination regarding his ineffective assistance of trial counsel claim. Shawn contended that Mayer rendered ineffective assistance because he did not pursue the audiotape and computer issues prior to trial, and he did not present evidence about them to the jury. Ineffective assistance of counsel is a single claim no matter the number of attorney errors it is based on. *See Peoples v. United States*, 403 F.3d 844, 847-48 (7th Cir. 2005).

The appeals court noted that Shawn's arguments regarding

- 23 -

withholding of evidence and ineffective assistance of counsel were interrelated. It stated that to establish an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that the deficiency was prejudicial. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must establish that counsel's conduct fell below an objective standard of reasonableness. *Id.* at 687-88. To prove prejudice, "the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Thiel,* 264 Wis. 2d 571, 665 N.W.2d 305, 314 (Wis. 2003) (quoting *Strickland,* 466 U.S. at 694). The critical focus is not on the outcome of the trial but on the reliability of the proceedings. *Id.* The appeals court also noted that when analyzing an ineffective assistance claim, a court may choose to address either the deficient performance prong or the prejudice prong. *State v. Williams,* 237 Wis. 2d 591, 614 N.W.2d 11, 19 (Wis. Ct. App. 2000). If the court concludes that the defendant has made an inadequate showing with respect to one component, it need not address the other. *Id.*

For claims of ineffective assistance of counsel, the *Strickland* standard governs whether counsel's performance is constitutionally effective. *Harrington v. Richter,* 562 U.S. 86, 102 (2011). *Strickland* dictates that the

- 24 -

party making the ineffective assistance claim must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688, 694. This standard is viewed through the lens of § 2254(d)(1)'s "contrary to" or "unreasonable application of" provisions: "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter,* 562 U.S. at 105. A habeas petitioner "'must do more than show he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance. . . . [H]e must show that the [appeals court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Emerson v. Shaw,* 575 F.3d 680, 685 (7th Cir. 2009) (quoting *Bell v. Cone,* 535 U.S. 685, 698-99 (2002)). Unless a petitioner can establish that disputed testimony was inadmissible, he cannot show that his defense counsel was constitutionally deficient for failing to raise a hearsay objection. *See Lambert v. McBride*, 365 F.3d 557, 564 (7th Cir. 2004) (finding no deficient performance where the proposed objection would have been overruled if made); *United States v. Neeley,* 189 F.3d 670, 684 (7th Cir. 1999) ("Obviously, counsel cannot be considered ineffective for failing to make an objection to the introduction of evidence that was properly admitted.")

- 25 -

(citations omitted)

The court of appeals noted that with some exceptions inapplicable to Shawn's situation, Wis. Stat. § 906.08(2) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility . . . may not be proved by extrinsic evidence. (Appeals Ct. Dec. 6.) (ECF No. 6-4.) (citing *State v. Rognrud,* 156 Wis. 2d 783, 787, 457 N.W.2d 573, 575 (Wis. Ct. App. 1990)). Extrinsic evidence is evidence admitted other than through examination of the witness whose impeachment is sought. *State v. Sonnenberg,* 117 Wis. 2d 159, 344 N.W.2d 95, 99-100 (Wis. 1984). (Citation omitted.) "A matter is collateral if the fact as to which error is predicated could not be shown in evidence for any purpose independently of the contradiction." *Rognrud,* 457 N.W.2d at 575 (citation omitted).

According to the appeals court, the issue at trial was whether Shawn engaged in repeated sexual assaults of J.L.L., H.A.L., and S.R.K. It held that Shawn was raising collateral matters regarding the computer and audiotape issues: (1) whether H.A.L. saw child pornography or homemade sex photos on one of Shawn's home computers; (2) that the forensic examination revealed no child pornography or homemade sex photos, and that there was no evidence that the computers had been wiped clean; and (3) whether Shawn or Kelly G. badgered or threatened Ott or Koenigs about the computer that had been transferred to them. Thus, the appeals court held that the introduction of

- 26 -

extrinsic evidence on these collateral issues would have been for the purpose of attacking the credibility of H.A.L. and Nalley and would have been inadmissible under Wis. Stat. § 906.08(2), which prohibits the use of extrinsic evidence to impeach a witness's credibility on a collateral matter. Noting that an attorney's failure to pursue a meritless motion does not constitute deficient representation, *State v. Cummings,* 199 Wis. 2d 721, 546 N.W.2d 406, 416 n.10 (Wis. 1996), and that the forensic computer report and the audiotapes would have been inadmissible at trial, the appeals court held that counsel did not render deficient performance, and Shawn was not prejudiced by Mayer's failure to pursue these matters.

The appeals court further concurred with the trial court that Shawn could not circumvent the limitations of Wis. Stat. § 906.08(2) by claiming that the evidence went to bias rather than credibility, noting that the bias of a witness is not a collateral issue, and extrinsic evidence may be presented to prove that a witness has a motive to testify falsely. *State v. Williamson,* 84 Wis. 2d 370, 267 N.W.2d 337, 343 (Wis. 1978). While Shawn argued at trial and in post-conviction proceedings that Nalley had an agenda to get him convicted, he did not present any evidence that Nalley was actually biased or had reason to be biased. Similarly, Shawn could show no bias on H.A.L.'s part. Consequently, the appeals court held that Shawn failed to prove his trial counsel was ineffective in his handling of the computer report or the

audiotapes of the jail conversations.

The appeals court addressed Shawn's contentions that his trial counsel rendered ineffective assistance by not pursuing information contained in a police report prepared by Nalley and provided to trial counsel in pretrial discovery (the "Nalley report"). The report indicated that H.A.L. and S.R.K. had been involved in inappropriate sexual acts with S.C., a neighbor girl who was seven when the complaint against Shawn involving H.A.L. and S.R.K. was filed. Shawn also contended that the prosecutor should have disclosed a report written by social worker Burns (the "Burns report"). Burns had interviewed S.C. regarding her sexual contact with five other neighborhood children close to her age, one of whom had been a victim of sexual abuse by an adult awaiting trial. Shawn contended that the information in the Burns report, which indicated that H.A.L. and S.R.K. had prior sexual contact with S.C., could provide an alternative basis for their sexual knowledge and was relevant because it reflected the bias of Nalley and Burns.

The appeals court provided multiple reasons for rejecting Shawn's contentions. It noted that Nalley's report was based on the information in the Burns report, and the Burns report did not specify that S.C. had sexual contact with H.A.L. or S.R.K. The appeals court observed that at the post-conviction hearing Shawn presented no evidence of sexual contact between S.C. and H.A.L. or S.R.K. Even if the defense could have presented such

- 28 -

evidence to show a source other than Shawn for H.A.L. and S.R.K.'s sexual knowledge, there was no prejudice from either Mayer's failure to pursue the information in the Nalley report or the prosecutor's failure to disclose the Burns report earlier, because the jury heard "abundant" other evidence that could have provided an alternative source of sexual knowledge for the victims. The appeals court cited the following testimony heard by the jury: (1) H.A.L. had been sexually assaulted by Leslie;[6] (2) H.A.L. and S.R.K. had repeatedly seen a movie containing a simulated scene of a male performing oral sex on a female; (3) there was an investigation into children sexually touching each other, and when S.R.K. was asked which of children had the worst problem of placing their hands on other children's privates, she said H.A.L., followed by S.C., A.V., and herself. Thus, the appeals court held that the jury was clearly informed that H.A.L. and S.R.K. had sources of sexual knowledge other than Shawn. It also noted that Nalley testified H.A.L. and S.R.K. provided drawings of Shawn's penis and described it as getting larger and smaller, which was clearly not information that they would have derived from having sexual contact with another little girl. Relying on these facts, the appeals court held that the prosecutor's pretrial failure to disclose the information about S.C. in the Burns report, and Mayer's failure to pursue the information about S.C. in the Nalley report, did not undermine its confidence in the

_____

[6] Leslie was also tried on sexual assault charges.

outcome of the trial, stating that there was no reasonable probability that the result of the proceeding would have been different had the jury been presented with evidence regarding sexual contact between S.C. and H.A.L. or S.R.K.

The appeals court correctly identified the controlling principles applicable to an ineffective assistance of counsel claim and did not unreasonably apply them when considering Shawn's claim that Mayer provided ineffective assistance, particularly with respect to its finding that Shawn did not show that he had been prejudiced. *See Price v. Thurmer,* 637 F.3d 831, 839 (7th Cir. 2011) ("[A] state court's determination that a defendant was not prejudiced by his lawyer's ineffectiveness is entitled to great weight in a federal habeas corpus proceeding."). Shawn's petition is denied on this ground.

### Confrontation Clause

The appeals court also held that to the extent H.A.L. and S.R.K.'s statements to Nalley and Burns were inconsistent with their testimony at trial, such statements did not constitute hearsay and were admissible pursuant to Wis. Stat. § 908.01(4)(a), which provides that a statement inconsistent with the declarant's testimony is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement. The appeals court also held that to the extent that the statements of H.A.L.

and S.R.K. admitted at trial were consistent with their prior statements to Nalley and Burns, the trial court performed the analysis required by *State v. Huntington,* 216 Wis. 2d 671, 575 N.W.2d 268, 275 (Wis. 1998) and *State v. Sorenson,* 143 Wis. 2d 226, 421 N.W.2d 77, 84-85 (Wis. 1988), and the statements were properly admitted under the residual hearsay rule provided in Wis. Stat. § 908.03(24). Thus, the appeals court held that Shawn's argument did not provide a basis to conclude that the trial court erroneously exercised its discretion in the analysis.

The appeals court noted Shawn's primary argument was that the admission of H.A.L. and S.R.K.'s statements violated his right to confrontation under *Crawford v. Washington,* 541 U.S. 36, 68 (2004), because at trial both girls testified before the statements they made to Nalley and Burns were admitted. However, the appeals court held that there was no confrontation clause violation because H.A.L. and S.R.K. testified at trial and were subject to cross-examination about their statements, and, relying on *State v. Nelis,* 300 Wis. 2d 415, 733 N.W.2d 619, 628 (Wis. 2007), the order of the testimony was irrelevant. The appeals court also noted that nothing in the record provided a basis to conclude that H.A.L. and S.R.K. were unavailable for recall after Nalley and Burns had testified, further defeating Shawn's confrontation clause argument. *See id.*

To the extent that Shawn is challenging the trial court's application of

- 31 -

Wisconsin rules of evidence, such challenges generally do not present a cognizable claim for federal habeas relief. *See, e.g., Dellinger v. Bowen,* 301 F.3d 758, 764 (7th Cir. 2002); *Perruquet v. Briley,* 390 F.3d 505, 511 (7th Cir. 2004). It is not "the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). However, the federal habeas court must evaluate a question otherwise reserved for state-court review where a specific constitutional right is implicated, or where "mechanistic application of state evidentiary rules may deprive criminal defendants of a fair trial." *Rice v. Bowen*, 264 F.3d 698, 702 (7th Cir. 2001); *see also Perruquet,* 390 F.3d at 511. Thus this Court considers whether the appeals court's ruling on the *Crawford* issue was an unreasonable application of the law.

The Sixth Amendment affords an accused the right "to be confronted with the witnesses against him." However, the Confrontation Clause is not implicated when an out-of-court declarant is subject to cross-examination at trial. *See Crawford,* 541 U.S. at 59 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."); *California v. Green*, 399 U.S. 149, 158 (1970) ("[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination"). S.R.K and

- 32 -

H.A.L. testified at trial, and they were available for cross-examination regarding the statements they made to Nalley and Burns. Because S.R.K and/or H.A.L could have been recalled for cross-examination to elicit evidence of any bias or motive they may have had, the appeals court's rejection of Shawn's claim that the trial court violated his confrontation right is not contrary to or an unreasonable application of Supreme Court precedent.

*Other Acts Evidence*

Shawn challenges the appeals court's determination that the trial court properly admitted other acts evidence, specifically that between the ages of 13 and 19 he engaged in sexual contact with a four-year-old nephew and three nine- and ten-year-old nieces. The appeals court noted that while "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith," (App. Ct. Dec. 16) (citing Wis. Stat. § 904.04(2)), it may be admitted when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The appeals court determined that the trial court properly applied Wisconsin law requiring evaluation of other acts evidence under the three-step analysis of *State v. Sullivan,* 216 Wis. 2d 768, 576 N.W.2d 30, 32-33 (Wis. 1998),[7] noting that "in

---

[7] That analysis requires that the trial court consider: (1) whether the evidence is offered for an acceptable purpose under Wis. Stat. § 904.04(2); (2) whether the evidence

- 33 -

sexual assault cases, especially those involving assaults against children, the greater latitude rule applies to the entire analysis of whether evidence of a defendant's other crimes was properly admitted at trial." (App. Ct. Dec. 17) (citing *State v. Davidson,* 236 Wis. 2d 537, 563, 613 N.W.2d 606, 619 (Wis. 2000)).

The appeals court held that the other acts evidence was properly admitted, noting that the trial court had carefully and properly exercised its discretion, and concluded that the evidence was offered for the acceptable purposes of proving motive, intent, and the absence of mistake or accident. The evidence was probative of Shawn's motive and intent in touching J.L.L., H.A.L., and S.R.K. and, as a result, was relevant to the issue of whether Shawn engaged in the charged conduct for the purpose of sexual gratification, an element the State was required to prove for conviction. *See* Wis. Stat. §§ 948.01(5)(a) and 948.025(1). The appeals court observed that the trial court concluded the similarities between the other acts and the charged offenses established the probative value of the other acts evidence, which substantially outweighed any danger of unfair prejudice. Furthermore, consistent with these determinations, the trial court had instructed the jurors that if they found the other acts occurred, they should consider those acts only in

is relevant; and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Sullivan*, 576 N.W.2d at 32-33.

evaluating motive, intent, and the absence of mistake or accident. The appeals court determined that evidence Shawn had previously sexually assaulted a four-year-old nephew and his prepubescent nieces was relevant to whether his motive and intent in touching the young victims in these cases was for the purpose of sexual gratification. It also noted that there were many similarities between the charged crimes and the other acts: (1) the victims all ranged from ages four to ten; (2) they were all relatives of Shawn or in a quasi-family relationship with him; (3) all of the assaults occurred at the homes of Shawn, the victims, or other relatives; and (4) the acts were of a similar nature and involved both male and female victims.

The appeals court upheld the determination that the other acts and charged crimes demonstrated a consistent pattern of directing sexual conduct toward minor children with whom Shawn shared a familial relationship and, therefore, made it more probable that he engaged in sexual contact with H.A.L., S.R.K., and J.L.L. for the purpose of sexual gratification, and that the other acts were not so remote in time as to be inadmissible, citing *State v. Opalewski,* 256 Wis. 2d 110, 647 N.W.2d 331, 336-337 (Wis. Ct. App. 2002).

In upholding the trial court's decision, the appeals court rejected Shawn's argument that the other acts evidence was not probative because he was a juvenile when he committed some of those acts. It concurred with the trial court that *State v. Barreau*, 257 Wis. 2d 203, 651 N.W.2d 12, 21-25 (Wis.

- 35 -

Ct. App. 2002), was distinguishable because *Barreau* involved the difference between a thirteen-year-old and a twenty-year-old when determining that evidence of a prior burglary was inadmissible at a later burglary and robbery trial. *Id.* at 23. The appeals court held that *Barreau* did not support a conclusion that the intent to obtain sexual gratification from children changes between a perpetrator's teens and twenties, and that the greater latitude rule did not apply to burglary cases but it did apply to child sexual assault cases. Based upon the record, the appeals court held that the trial court reasonably concluded the other acts evidence was relevant and admissible for a proper purpose, and given that the trial court also minimized or eliminated the risk of unfair prejudice by giving an appropriate cautionary instruction, *see State v. Hammer,* 236 Wis. 2d 686, 613 N.W.2d 629, 639-40 (Wis. 2000), there was no basis to disturb its decision admitting the evidence.

Watkins v. Meloy, 95 F.3d 4, 6 (7th Cir. 1996), explains that "[w]hen a state keeps out evidence favorable to the criminal defendant or prevents him from cross-examining the prosecution's witnesses, it runs the risk of being found to have prevented him from defending himself or confronting the witnesses against him, in violation of the Sixth Amendment, which the Supreme Court has applied to the states through the Fourteenth Amendment." *Id.* (citing *Michigan v. Lucas,* 500 U.S. 145, 149 (1991*); Chambers v. Mississippi,* 410 U.S. 284 (1973))." However, "when the state

- 36 -

merely fails to limit the prosecution's evidence, the only constitutional principle to which the defendant can appeal is a catch-all sense of due process," *id.* at 6-7 (citing *Milone v. Camp,* 22 F.3d 693, 702 and n.9 (7th Cir. 1994); *United States ex rel. Lee v. Flannigan,* 884 F.2d 945, 953 (7th Cir. 1989)), "and the appeal almost always fails" *id.* (citing *Estelle,* 502 U.S. at 68-70; *Milone*, 22 F.3d at 702; *United States ex rel. Lee v. Flannigan,* 884 F.2d at 953; *Woodruff v. Lane,* 818 F.2d 1369, 1373-74 (7th Cir. 1987)). If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded; and if it is not probative, it will be hard to show how the defendant was hurt by its admission. To cross the constitutional threshold, something more than a "garden-variety" violation of the state's evidentiary rules must be shown. *Meloy,* 95 F.3d at 7.

An alleged other acts evidence violation does not necessarily give rise to any constitutional concerns. Thus, appealing on that evidentiary basis does not suffice to put the state courts on notice that one is raising a constitutional argument as well. Accordingly, this Court concludes that Shawn never presented a federal constitutional claim based on other acts evidence to the state courts. The fact that he may have used the term "fair trial" does not suffice to alert the state courts to the federal nature of his claim. Instead, this is the type of claim that "may well present the echo of a federal claim while still not alerting the state court to the federal nature of the claim." *Lieberman*

- 37 -

*v. Thomas,* 505 F.3d 665, 671 (7th Cir. 2007) (citing *Verdin v. O'Leary,* 972 F.2d 1467, 1475 (7th Cir. 1992)). It is too late for him to bring a new argument to the state court. Because Shawn's petition faltered at the state court level, he procedurally defaulted his federal due process claim, which he was required to fairly present at each level of state court review. *Lieberman,* 505 F.3d at 671 (7th Cir. 2007).

Shawn's failure to present his due process claim to the Wisconsin courts constitutes a fatal default barring federal habeas corpus review unless he demonstrates both "cause and prejudice" as a result of the default. *See Lieberman,* 505 F.3d at 669. Cause for a default is ordinarily established by showing that some type of "external impediment" prevented the petitioner from presenting his claim. *Promotor v. Pollard,* 628 F.3d 878, 887 (7th Cir. 2010) (quoting *Lewis v. Sternes,* 390 F.3d 1019, 1026 (7th Cir. 2004)). Prejudice is established by showing that the violation of the petitioner's federal rights "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.*

Shawn was represented by Sommers during the post-conviction proceedings and throughout the state appellate proceedings. Shawn does not suggest any cause for his default, and the record does not disclose any. In that respect, ineffective assistance of counsel can constitute cause for a procedural default, *Martinez v. Ryan,* 132 S. Ct. 1309, 1317 (2012), but Shawn

- 38 -

does not raise such a claim here. Even if cause were shown, given the overwhelming evidence of Shawn's repeated sexual assaults of S.R.K., H.A.L., and J.L.L., he cannot establish prejudice or demonstrate that a fundamental miscarriage of justice has occurred with respect to the admission of other crimes evidence

### *Certificate of Appealability*

Shawn may not appeal the final order in a habeas corpus proceeding where the detention complained of arises out of process issued by a state court unless the Court issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(a). A certificate may issue only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing, a petitioner must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (internal quotation marks omitted). For the reasons discussed above, Shawn has not made that substantial showing: reasonable jurists would not debate whether the challenges in his habeas petition should have been resolved differently or determine that Shawn deserves encouragement to proceed further with his habeas claims. *See Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). The claims decided on the merits were well within the deference owed

- 39 -

to state courts under the AEDPA. The Court therefore declines to issue a certificate of appealability.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

Shawn's petition for a writ of habeas corpus is **DENIED**;

This action is **DISMISSED**;

The Court declines to issue a certificate of appealability; and

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of August, 2015.

BY THE COURT:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 40 -